## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Docket No. 2:22-cr-00055-NT |
| | ) |
| RICK V. GREENE, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Rick Greene is charged in a five-count Indictment with two counts of Supplemental Security Income ("**SSI**") benefit fraud, in violation of 42 U.S.C. §§ 1383a(a)(3), (a)(2); one count of health care fraud, in violation of 18 U.S.C. § 1035(a)(1); and two counts of theft of government money, in violation of 18 U.S.C. § 641. Indictment (ECF No. 1). Before me is the Defendant's motion to suppress all statements that he made during an interaction with two law enforcement agents at his home and place of business on November 19, 2020. Def.'s Mot. to Suppress ("**Def.'s MTS**") (ECF No. 19). I held a hearing on the Defendant's motion on December 1, 2022. Minute Entry (ECF No. 24). For the reasons set out below, I **DENY** the motion to suppress.

### FACTUAL BACKGROUND[1]

On November 19, 2020, a chilly Maine day, Special Agent Matthew DiCarlo of the Social Security Administration's Office of the Inspector General and Investigator

---

[1] This factual background is drawn from the evidentiary hearing held before me on December 1, 2022 (ECF No. 24) and the Defendant's Affidavit (ECF No. 22-1).

Charity Klinger of the Maine Department of Health & Human Services Fraud Investigation and Recovery Unit visited the Defendant at his home and place of business. The Defendant operated an auto mechanic business in a commercial garage in Livermore Falls, which was attached to his home. When the agents entered the garage, they introduced themselves, showed their credentials, and explained that they were there to talk to the Defendant about his SSI benefits and his work. Agent DiCarlo indicated to the Defendant that he did not have to talk to them and that he was free to leave at any time.

There was conflicting testimony about whether other people were present in the garage at the time the agents arrived, whether the agents asked those people to leave, whether the agents locked the garage doors or told the Defendant to lock the doors, and whether Agent DiCarlo's weapon was visible. Agent DiCarlo did not recall other people being present and stated that the doors were never locked. Investigator Klinger testified that the Defendant's adult daughter and another male individual were present when they arrived, and she recalled that the doors were locked during the interview. The Defendant testified that his daughter and a male customer were present when the agents arrived and that they were asked to leave. The Defendant also testified that the agents asked him to lock the doors. Both agents testified that it was their practice to conduct interviews without other people present given the sensitive subject matter and to preserve the privacy of the interviewee. I find that when the agents arrived, two other individuals were present and the agents asked them to leave. I further find that the Defendant was asked to lock the door to prevent

2

customers from coming in during the interview. Agent DiCarlo testified that his firearm was concealed under his winter coat, but I credit the Defendant's testimony that he saw Agent DiCarlo's firearm.

Once they were alone with Mr. Greene in the garage, the agents advised the Defendant that they were following up on a complaint they had received about his self-employment, which could affect his SSI benefits. Agent DiCarlo presented the Defendant with an Advisement of Rights (Non-Custodial) and Waiver of Rights form, which informed him that he was not under arrest and that he had the rights to remain silent and/or to terminate the interview at any time. Gov't's Hr'g Ex. 1 — SS Advisement of Rights Waiver Form ("**Advisement of Rights**"). Mr. Greene signed the form, attesting that he had read it, understood the rights that he was waiving, and that he was willing to make a statement and answer questions voluntarily. Advisement of Rights.

The agents were aware going into the interview that the Defendant was suffering from various mental health illnesses including anxiety, bipolar disorder, and agoraphobia. The Defendant testified that these mental illnesses make it difficult for him to be around crowds, that he is very nervous when dealing with people, and that the agents' visit made him scared and caused him to have an anxiety attack. Though the agents testified that the Defendant seemed nervous once he learned the allegations against him, there is no evidence that the Defendant communicated to the agents that he was having an anxiety attack or that he showed any unusual external signs of distress.

3

The interview lasted roughly 45 minutes. During that time, the agents did not raise their voices or draw their weapons. The agents made no threats or promises to the Defendant in exchange for answers to their questions, and they did not mislead him at any time. Agent DiCarlo remarked that the Defendant was forthcoming and appeared honest when speaking about his business and that he seemed proud of his business accomplishments. The agents thought that the Defendant became reluctant to answer some questions when he thought that he was incriminating himself. At one point, the Defendant mentioned that he kept electronic business records of all the work he did in spreadsheets on his computer, but he declined to show those records to the agents when they asked to see them.

At the end of the interview, the Defendant agreed to provide a written statement of what they discussed in the interview. In his first three pages, the Defendant wrote about how he started and operated his business, including how much money he made on average, as well as his history of receiving Social Security benefits and his regret over not reporting his work to the Administration. Gov't's Hr'g Ex. 2 — Def.'s Written Statement. After reviewing the statement, Agent DiCarlo added a summary in his own handwriting on the fourth page, which the Defendant initialed and annotated as being "true and correct." Ultimately, the Defendant accepted the entire statement as his own with his signature on page five. The Defendant testified that he wrote the statement because the agents told him to and he was scared that he was going to go to jail.

After collecting Mr. Greene's statement, the agents left. The Defendant was never placed under arrest. The Government obtained an indictment against the Defendant on May 4, 2022, and the Defendant voluntarily appeared for his initial appearance and arraignment on May 17, 2022, when he entered a plea of not guilty on all counts and was released on bail conditions. Indictment; Minute Entry (ECF No. 6).

## LEGAL STANDARD

Both the Self-Incrimination Clause and the Due Process Clause of the Fifth and Fourteenth Amendments prohibit the use of a defendant's involuntary statement against that defendant in court proceedings. *See Michigan v. Tucker*, 417 U.S. 433, 438 (1974); *Mincey v. Arizona*, 437 U.S. 385, 398 (1978); *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). "The burden rests with the government to prove voluntariness by a preponderance of the evidence." *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990).

## DISCUSSION

The Defendant argues that his statements were involuntary, and, therefore, should be suppressed. Def.'s MTS 1–2. Specifically, Mr. Greene asserts that the agents pressured him into talking to them and that he "believed [he] would be arrested if [he] did not speak to them." Def.'s Aff. 1 (ECF No. 22-1); Def.'s MTS 1. Mr. Greene also states that the agents "put words in [his] mouth and insisted on changes and additions to [his] written statement." Def.'s Aff. 1.

The test for voluntariness is "whether the will of the defendant ha[s] been overborne so that the statement was not his free and voluntary act." *United States v.*

5

*Orne*, 2:21-cr-133-JDL, 2022 WL 1997216, at *4 (D. Me. June 6, 2022) (citing *Bryant v. Vose*, 785 F.2d 364, 367–68 (1st Cir. 1986)); *Procunier v. Atchley*, 400 U.S. 446, 453 (1971). While it is a consideration in my analysis, "[a] defendant's mental state or condition . . . is never dispositive of the inquiry into constitutional voluntariness[;]" instead, this assessment has "always depended on" the actions of the investigating agents. *United States v. Rojas-Tapia*, 446 F.3d 1, 7 (1st Cir. 2006) (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)); *see also Connelly*, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.").

Extreme behavior by the investigating agents is far more likely to be categorized as coercive than routine questioning. *See United States v. Smith*, 919 F.3d 1, 12 (1st Cir. 2019) (comparing tactics that the Supreme Court has found to be coercive—breaking into homes to perform searches, holding the defendants at gunpoint, and arresting them, all without probable cause—with what it found to be non-coercive behavior by "agents [who] were professional and polite throughout their interactions with" the defendant); *United States v. Diaz Torres*, Crim. No. 20-457, 2021 WL 5176812, at *3 (D.P.R. Nov. 8, 2021) ("[C]oercive tactics include, but are not limited to, beating a confession out of a suspect, inducing intoxication or a drugged state where further statements can be coerced from them or compelling a confession by psychological pressure."); *see also United States v. Rondeau*, No. 20-40049-TSH, 2022 WL 4084311, at *7–8 (D. Mass. Sept. 6, 2022) (finding no coercion where a

6

defendant was interviewed in his home for one hour by agents who remained cordial and never brandished their weapons, and the defendant never asked them to leave or requested an attorney).

Ultimately, "[j]udging whether improper police coercion occurred depends on the circumstances." *United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998). As such, in reviewing this motion, I must engage in a "totality of the circumstances" inquiry, balancing "the officers' tactics with the unique background of each individual suspect" to determine "whether the government's conduct overtook the will of the defendant." *United States v. Hufstetler*, 782 F.3d 19, 22 (1st Cir. 2015). Relevant factors in this analysis include: "the length and nature of the questioning, promises or threats made by investigators, any deprivation of the suspect's essential needs, and the defendant's personal circumstances—i.e. age, education, intelligence, mental condition, and prior experience with the criminal justice system." *United States v. Doody*, No. 1:19-cr-00134-LEW-7, 2020 WL 1466202, at *1 (D. Me. Mar. 26, 2020); *United States v. Hughes,* 640 F.3d 428, 438 (1st Cir. 2011); *United States v. Carr*, 534 F. Supp. 3d 143, 151–52 (D. Me. 2021).

While it may be true, as defense counsel argued at the hearing, that coercion may exist even absent extreme behavior, the facts here do not support Mr. Greene's contention that his statements were involuntary. First, neither the length nor the nature of the questioning supports a finding of coercion. The interview only lasted for about forty-five minutes, a relatively short length of time, and the agents interviewed the Defendant in a familiar location—the garage of his business, which was also

7

located at his home. *Rondeau*, 2022 WL 4084311, at *7 ("The more familiar or neutral the setting of the interview, the less likely it will be deemed to have a coercive overtone, as is usually the case when questioning takes place in a suspect's own home." (citing *Beckwith v. United States*, 425 U.S. 341, 347 (1976))). Assuming it was the agents who asked the Defendant's daughter and the customer to leave the garage and who asked the Defendant to lock the doors, I credit the agents' testimony that they were trying to conduct the interview of the Defendant in private.[2]

I also do not agree with the Defendant's characterization that the words written by Agent DiCarlo on the fourth page of his written statement were "more [the agent's] words than [the Defendant's]" such that this behavior was coercive. The agent's summary is a more direct framing of information already contained in the first three pages of the statement. The Defendant ultimately adopted these statements as his own through his initials and annotation that they were "true and correct" at the bottom of the page and his signature on the fifth and final page.

Although the Defendant was able to see Special Agent DiCarlo's weapon, there is no suggestion that Special Agent DiCarlo alluded to the firearm or brandished it. *See United States v. Drayton*, 536 U.S. 194, 205 (2002) (finding that since it is "well known" that most law enforcement officers are armed, "[t]he presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon"); *see also Rondeau*, 2022 WL 4084311, at *6–7

---

[2]  The Defendant makes no argument that locked doors effectively turned the interview into custodial interrogation.

(finding no coercion where, among other things, agents never brandished their weapons). A determination of involuntariness requires some coercive behavior on the part of the investigating agents, and here, I do not find any. *See Connelly*, 479 U.S. at 167. Accordingly, I cannot conclude that Mr. Greene's statements were involuntary. *See id.*

Although I could end the analysis here, even when I consider Mr. Greene's mental health conditions the result is the same. The Defendant does not argue that he did not understand his rights. Although he claimed to be experiencing an anxiety attack during the interview, the Defendant did not tell that to the agents. And based on the agents' testimony, the Defendant did not have any trouble communicating and did not appear to be exhibiting any mental difficulties or symptoms that would have made him especially vulnerable to their questions.[3] The Defendant was understandably nervous when the agents wanted to speak with him, but a defendant's subjective feelings of nervousness are not enough to render his statements involuntary. *See United States v. Bey*, 825 F.3d 75, 80 (1st Cir. 2016) ("While the consenting party's possibly vulnerable subjective state is a factor in our balancing approach, it is but one." (internal citation and quotation marks omitted)). The agents made no threats or promises to the Defendant, nor did they lie to him or mislead him about why they were there. Overall, there is no indication that the

---

[3] The agents' testimony that they were not able to perceive any mental distress on the part of Mr. Greene is bolstered by the fact that Mr. Greene testified before me and roughly twenty other people in a courtroom—a far larger crowd than was present in the garage—and I saw no evidence of any distress aside from some slight public speaking jitters.

9

agents engaged in manipulative tactics or sought to exploit the Defendant or his mental condition in a manner that would render his statements involuntary.

The Defendant further bases his involuntariness claim on the belief that he was going to be arrested if he did not speak with the agents, however I am not persuaded by this argument. The Defendant has a lengthy criminal history—over fifty interactions with law enforcement between 1981 and 2010. Gov't's Hr'g Ex. 3 — Def.'s Criminal History; *see United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014) (one factor indicating that the defendant spoke knowingly and voluntarily with law enforcement was his involvement as "a defendant in multiple criminal matters in the past," demonstrating that he "was experienced with the justice system"); *see also United States v. Pagnani*, No. 2:19-cr-00200-GZS, 2021 WL 2210584, at *5 (D. Me. June 1, 2021) (finding that the defendant "had significant prior experience with the criminal justice system and, as a result, was well versed in her *Miranda* rights"). He was advised of his rights upon the agents' arrival, including that he was not under arrest, that he was not required to speak, and that he was free to leave at any time. He signed a form not only acknowledging his rights but waiving them. Advisement of Rights. He also clearly demonstrated that he understood his right not to speak to the agents when he refused to show them his business records upon their request. *See United States v. Andrade*, Criminal Action No. 13-10140-RGS, 2014 WL 4232676, at *3 (D. Mass. Aug. 26, 2014) (the defendant's refusal to speak with agents during an initial encounter was relevant to the validity of her waiver during a subsequent non-

10

custodial interview and showed that she knew that she did not have to talk to them). This undercuts his claim that his will was overborne.

In sum, looking at the totality of the circumstances, I find that the Government has satisfied its burden to prove, by a preponderance of the evidence, that Special Agent DiCarlo and Investigator Klinger did not overbear the Defendant's will and, thus, that his inculpatory statements were made voluntarily.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's Motion to Suppress (ECF No. 19).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 13th day of December, 2022.